The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw, are admonished to give their attention, for the court is now sitting. God save the United States and this Honorable Court. All right, we're prepared to hear argument in number 20-1420, Billioni v. Bryant. And Mr. Butler, you may begin. Thank you, Your Honor, and may it please the court. If the district court's ruling below is allowed to stand in this case, no whistleblower will ever speak out again about the most serious form of government misconduct, and that is excessive use of force by police out of plain sight and the attempt to cover it up. However, that ruling cannot stand, luckily for the First Amendment, it cannot stand because the district court improperly gave too little value to Mr. Billioni's speech, which this court described, and I'm quoting this court from the prior opinion in this case, described Mr. Billioni's speech as pertaining to, quote, the role of an officer's use of force played in a man's in-custody death, directly contradicting the York County Sheriff's Office's official statement on the incident. Our court, this court, places the highest value on such speech. That comes from Durham v. Jones. Police misconduct involving excessive use of force and subsequent cover-up is exactly what Durham v. Jones speaks to and said that is protective speech. That mistake by the district court judge threw off the entire balancing process. The entire balancing process was thrown off by miscalculating the value of Mr. Billioni's speech and led to the ruling because of that mistake. That is especially so because the only disruption that the sheriff appealed to and the district court found was the internal investigation and the violation of a confidentiality order, which have been found insufficient in light of the value of speech like this in our cases like Durham, Andrew v. Clark, Hunter v. Town of Mottsville. Mr. Butler, I don't think we're talking about covering things up and shutting off whistleblowers. It's just a question of timing. And it's just a matter of allowing an internal investigation to wrap up and complete. I mean, I know there's a lot of suspicion of internal investigations, but they're worth something and oftentimes they can do the job. But after the investigation is over and offered his view of things, it's all a matter of timing, isn't it? Not in this case, your honor. I would have to disagree. And the reason that this case is different was because the sheriff had announced that for all practical purposes that the investigation had been completed and he had arrived at a conclusion that was just false. And in the sheriff's spokesperson speaks, he lies when he says that the correctional officer Moore and everybody else acted appropriately. So when Mr. Bilioni hears that, I think he's justified in thinking, well, the investigation is complete and now that I've seen this video, and if I had only three words for my argument, it's watch the video. When he sees the video contrasted to what that the investigation is completed and to speak out. And those two facts make this case unique in this jurisprudence. There's no other case that I'm aware of. Mr. Butler, let me ask you, was there ever a time that Mr. Bilioni attempted to raise a question in the sheriff's department and go up the chain of command? He did not because doing so would have been futile. Well, how do we know? How do we know that? I mean, it's easy to say that, but I think in this case, you had investigations not only by the sheriff's office, but the state solicitor, the federal Department of Justice and the South Carolina Law Enforcement Division. And none of those were allowed to play out by Mr. Bilioni. He preempted all of those by acting so quickly. Yes, sir. My first response is the futility comes from Mr. Ferris's statement that everybody acted appropriately. That's my first response. My second response as to, for example, the sled investigation, Mr. Bilioni can't be held responsible for that. That operates as a matter of law by statute. And those other criminal investigations were focusing on a completely different matter. They were looking to see whether or not anybody acted criminally. What Mr. Ferris says is everybody acted appropriately. And I think Mr. Bilioni was well within his rights after having viewed the video to say, I need to set the record straight. You know, nobody made the sheriff hold that. Why didn't he set the record straight by going up the chain of command in the sheriff's department? Because the sheriff had already spoken on the matter when he holds that press conference. The sheriff seems to me can't have it both ways. He can't invite public discourse by telling something that's false, invite public discourse, then at the same time want to shut it down until it pleases him for someone to speak out about it. Now, if they had not held that press conference and had Mr. Ferris not mischaracterized not only the behavior of their officers, but the behavior of Mr. Gross, the inmate who dies, blaming him for his own death, then perhaps Mr. Bilioni should have waited. But it's not only that Mr. Bilioni's right to speak out is triggered by that false statement. It's also that time is of the essence. Time is of the essence in this case because videotapes can disappear, evidence can disappear, and it's not wrong to be somewhat suspicious when you've already seen evidence of a cover-up to think, you know, how many more times, by the way, do we have to let Officer Moore pummel someone? Yeah, but what basis is there in the record for you to represent that there was a fear of disappearing evidence? No. Well, except that he says, Mr. Bilioni does say, look, the fact that an inmate died in our custody is itself evidence that not everybody did what they were supposed to do. But no, is there evidence where Mr. Bilioni comes out and says, I was afraid evidence was going to disappear? No. But I think it's fair for us to say that time was of the essence and that he didn't have to wait for these other independent investigations, which occur in other cases too and have not overridden the value of the speech. We have to keep in mind that the speech in this case is of the highest level of protection and the disruption, as alleged, is of the lowest level. And that other mistake that the District Court made was the District Court, instead of seeing the evidence in the light most favorable to Mr. Bilioni, saw it and viewed it in the light most favorable to the sheriff. And that was another mistake to assume, to just assume from the fact that there's an internal investigation that that's disruptive. I was under the impression that the internal investigation had not been based upon what Mr. Farris says is that it had been completed. When Mr. Farris says... Well, I mean, maybe that, you know, a lot of times people can issue a statement and everything, but that doesn't mean the investigation was complete. When a public employer and an elected official issues a statement like that, that he doesn't have to make, I think he invites public discourse on that matter. That's exactly what the First Amendment is for. It's the marketplace of ideas where there are competing viewpoints. But nobody's saying that the competing viewpoints couldn't be aired, it's just a question of when they're aired. And, you know, you want the department is a paramilitary organization, and it has some interest in internal order and internal discipline. And it has a right to complete its own work. And then if somebody disagrees, they have two options. One is, as Judge Agee pointed out, to go up the chain of command. And then the other option is, once the investigation has been wrapped up, then they can blow the whistle to their heart's content. There's one other question that I have, and that is that part of this was that Mr. Bilioni is said to have lied repeatedly about whether he had leaked anything. He, you know, had lost confidence in him because he wouldn't come forward with a true account of what happened. And the sheriff would have been well within his rights to fire Mr. Bilioni on that grounds, but that's a jury issue. That's the third prong of McVeigh, and that's an excellent closing argument for Mr. Johnson to make before a jury. But with respect to the paramilitary... Why is that necessarily a matter of the third prong? Why isn't it a matter of the balance between the public and the speech interest? And there's a question of the remand was one whether the sheriff had a reasonable apprehension of departmental disruption and a reasonable apprehension of disorder. And I thought that that was the subject of the remand is whether on the part of the sheriff there was a reasonable apprehension of disorder. And if someone has lied repeatedly about whether he had leaked information, wouldn't that give rise to a reasonable apprehension? No, I don't. I don't believe so because Mr. Bilioni is not claiming protection for that part of his speech. I think they're clearly separate, and he's not claiming protection for the lie. Mr. Hunter, isn't there some inconsistency in this case? There is a footnote in a reply brief that at least six other officers spoke to their wives about this incident while this quote investigation was ongoing. Nothing happened to them at all. That would seem to me to be inconsistent. Yes, yes, your honor. Well, do you know that to be a fact? I do not know that to be a fact. I assure you it's in a footnote in a reply. Do you know one other question? I'm going to ask the other side, same question. Do you know whether or not SLED was contacted or had begun its investigation before or after the media contacted the sheriff's department? The SLED investigation had already begun. The SLED investigation had began on the 22nd, and I take that back. I apologize. I misspoke. Mr. Bilioni tells his wife, he tells his wife on the 21st, and SLED begins their investigation on the 22nd. So it was the following day. So that would be before the press made the contact. Yes, yes, but yeah, yes, before SLED, I believe that's right. Before press makes the contact to the sheriff's department, I believe that that's correct. I apologize for having to not be 100% on that, Judge Floyd, but I think that's right. But so you're just just to be sure, following your answer, your representation, which opposing counsel ought to answer, as Judge Floyd indicated, the same question is that the SLED investigation had begun before the press contacted the sheriff's office. Yes, yes, that's right. I just want to be sure. Yes, and I didn't want to speak to the paramilitary. Excuse me, you said that the investigation had begun, had previously begun before he contacted the media. What was your answer, counsel? I believe that the SLED starts investigating on the 22nd. Mr. Bilioni tells his wife on the 21st, but the press does not contact the sheriff until, I believe, after SLED starts the investigation. No, I'm being told I'm wrong. I apologize for not having that fact straight. And it seems I'm out of time. Well, let me ask my colleagues if they have any questions of you. Judge Agee, do you have any questions of Mr. Butler? Perhaps on rebuttal, if you've got the time during discussion, you could check that out and see if you could give us an answer. And we'll ask counsel for the other side to do the same. Yes, sir. Yes, sir. My apologies. Yes, sir. All right. Judge Floyd, do you have some questions of Mr. Butler? No, sir. All right. Well, you have some rebuttal time, Mr. Butler, and we'll now hear from Mr. Johnson. Good morning. May it please the court. Again, my name is Chris Johnson with Genelat Savitz & Bettis in Columbia, South Carolina, and I the Bruce Bryant, the now-retired sheriff of York County. To address, I guess, first the court's question about the timing, SLED was called in as soon as the death was reported to the sheriff. So they showed up. I apologize, I don't have a timeline in front of me or the dates, but Mr. Gross, the inmate, the struggle and his passing occurred in the wee hours of the morning, from 1 a.m. to 3 a.m., I think, or maybe even longer, but it was early in the morning, and SLED was called in early that morning and arrived on scene. And what date was that morning? I don't know, and I can, it's in, I know it's in the plaintiff's deposition, and I was trying to find it, and I couldn't put my hand directly on it. Okay, well, go ahead. But it's your representation that, to the best of your knowledge, SLED was called in the same day as the inmate died. Yes, your honor. Okay. Mr. Johnson, let me ask you about, when SLED is called in to undertake an investigation, then the agency that they're investigating is no longer in the investigatory process, are they? Because it's SLED's investigation at that point. Okay. So, what was going on at that time was, there were two investigations. One was obviously the state law enforcement division, SLED, investigating the death, and then there was also an internal affairs, internal investigation into what happened, so that, you know, to see if there were any policies that were violated, or any lessons that needed to be learned from the incident. And so, the internal investigation was in the sheriff's department, is that correct or not? Yes, your honor. Okay. And was the leak while the internal investigation was going on? Yes, your honor. It occurred while both were ongoing by the- Both the SLED investigation and the internal investigation were ongoing when the leak occurred. Yes, your honor. That is correct. Um, then, Mr. Butler said that the fact that he had lied about the, denied having, doing a leaking, what was it, the video or just the contents of the video that was leaked? Was it the video itself or what? No, your honor. It was, it was detailed information about what was in the video. Okay. And, and, and ultimately, I mean, we only have, we have plaintiff's testimony about what he told his wife, and then we have the sheriff's testimony about what the reporter who, who worked for the same news agency as, as plaintiff's wife reported into. Well, is it, it's undisputed that Mr. Bilioni was the one who leaked, is it not? Yes, your honor. That, that is correct. That's undisputed. Um, is it also undisputed that he, when questioned about whether he leaked it, that he lied about that? That is correct, your honor. He admitted, um, in his deposition numerous times that, that he did not tell the truth. Um, is that purely a matter of, um, causation or would the fact that he lied repeatedly figure into the conic pickering balance? Well, your honor, I think it goes to both, um, uh, and, and on the conic pickering balance that, I mean, again, the sheriff, I mean, the sheriff can't, can't be expected to think forward, um, you know, six, seven years now. And, um, and he's got to deal with what he's got at the time. And, um, you know, what, what he had was a, uh, both a, a breach of his confidentiality policy, um, and a breach of the, the policy that requires, uh, his officers to, um, to cooperate in internal investigations and to tell the truth. Um, so I, I, I think that certainly, um, would, would weigh in the balance of, uh, the relative value of, of plaintiff's speech. And I think the other thing to keep in mind is that this court has said, um, previously that you can't, you can't try to, um, to, to parse the speech into different, into different little buckets and say, well, this is protected and this is not protected. Um, you have to look at it as a whole. I think the Stroman case, um, stands for that. And, and so when you, when you look at, um, officer Bilioni's, uh, speech as a whole, um, I, I think it, it's pretty clear that it, um, that, that when you balance the, the interests of the sheriff's office in not only maintaining order and discipline, but making sure accurate information gets delivered to the public, um, you know, public confidence in the sheriff's office, um, in, in being able to, to bring these investigations to a close in an orderly manner without, um, trying to chase down, uh, inaccurate information, which is what wound up happening. Um, uh, then, then I, I think it's pretty clear that, that the sheriff's interests, um, strongly outweigh the plaintiff's. Well, Mr. Johnson, what kind of disruption did, uh, the sheriff actually experience or feared? Um, well, again, the standard is, is what he apprehended, not, not actual disruption because it's a discipline case. So, um, but, but the sheriff testified at length that, that when he got this information that, um, that this, that the inmate, excuse me, that, that the reporter had a, an inside source who said that the inmate had been beaten 12 times in the head, he was obligated to go and run that down because, um, what the plaintiff doesn't know at this point is, is, is at the time Trent Ferris, the public information officer gives his, um, gives his, uh, uh, press conference. The, the SLED agents have already interviewed the, um, the officers that were involved in the matter and they've told, um, they've told the, the chief jail, the chief jail administrator, Freddie Arwood, that preliminarily, they haven't finished their investigation, but preliminarily they don't see anything wrong. And so that's the basis of Trent Ferris' statement. Um, so, and I apologize, I lost my train of thought. You had asked me, um. I wanted, I wanted you to particularize the, what, what he, what fear he had, what disruption he apprehended or what actual disruption, either one. Right. So, so at the time, the sheriff is under the impression from what he's been told preliminarily by SLED that, that there's not anything wrong with, with what his, how his officers responded to this situation. And now he's got a reporter telling him something that he's not heard or seen, which is that the, the inmate was, was beaten 12 times in the head, which would be a big difference from, from simply a struggle to, to restrain him. And so now he's got to go and he's got to track down, um, where that information came from and, and whether or not that there is, somebody saw something that his folks didn't see. Um, and so that's the, you know, I think that's part of the apprehension. And then the other part of it is, and the sheriff testified at length about this, is that, is that he's now got an officer he can't trust because the officer lied, um, when, uh, when the, um, when asked about the, you know, whether he had spoken with anyone outside the organization about the video. Well, Mr. Johnson, we, what we got here is a preponderance of the perjury. You got the, you got the spokesman for the share line, and then you, you say this to Billy only line. Uh, there's a lot going on on both sides. My question is why did not, why did the sheriff not look at that video? The first thing when he got on the job, and then he would have known the truth from the beginning in a matter of minutes. Well, I mean, that's just it. You're right. First of all, the testimony from the sheriff was that he had seen it, but, but the fact is, uh, I mean, saying he knows the truth, you know, again, he's got a reporter calling him and saying, he's got an inside source that, that indicates that, that the inmate was, was hit in the head. You can't just ignore that because, because then he's going to have media reports in the press that his officers have and the other thing, your honor, that I would point out is there's not lying on both sides going on. Trent Ferris, the public information officer did not tell a lie. The, the information that, that he had, that had come from ultimately from the state law enforcement division was that preliminarily nothing, these officers had not done anything wrong. So that's not a lie that he's telling. He's, he's reporting the status as it is at that point. Um, Judge Mox has written, um, a, um, concurring opinion in the Crosby Towns of Monks Corner, um, says that the public has no question that the public has an interest in learning about police misconduct. But she said the, uh, free speech interest in attacking the department is far stronger when the normal process of accountability fails and says the interest is far less compelling when a police department is not even given a chance to review or investigate an incident and says this is especially true when officers rush out to speak about an incident of which they have no personal knowledge. Um, so that, that would seem to me to be, um, relevant here because, uh, uh, if we were trying to hush up criticism of the department, um, uh, I would never go along with anything like that. Um, it's, it's just a question of whether, as Judge, Judge Mox indicated, whether the department should be given some time to collect the facts and make a considered judgment. In internal investigations, people are rightly suspicious of them, um, because sometimes they do sweep things under the rug, but other times they're very helpful. Um, uh, it's always better if, um, a department assumes responsibility, um, in the first instance for allegations of, of, uh, misconduct. Now, come back to Judge Agee's point. How can the department look into something if police officers, um, just say, oh, well, it's futile, but they don't go up the chain of command when a particular incident is involved here? Um, as I understand it, it's undisputed he did not go up the chain of command. Is that right? Yes, Your Honor. That is correct. And so I'm just puzzled as to how the internal investigation can proceed if somebody doesn't, um, help and cooperate in giving the sheriff the kind of information to allow the sheriff to make some kind of considered judgment. Um, this could happen on a very wide scale where internal investigations of all, of all kinds are interrupted in midstream, um, by someone saying, well, I have a different view. And then you, you start conducting these in the press. Um, that's, that's the concern, um, that I think Judge, Judge Mott's had in the Kraus saying nobody's interested in hushing up criticism of the police. I agree, Your Honor. I mean, the question, um, I think, as you indicated, um, at the outset, um, hearing Mr. Butler's argument was, is, is to a large degree, this is a question of timing. Um, the, the, the sheriff's office was not given an opportunity, um, to, to bring the, the sort of conclusion, um, and instead wound up having to chase down, you know, these wild, wild geese, um, you know, based on this, this information getting out and inaccurate information getting to, uh, to the reporter. Um, so I, I mean, I, I would agree. I don't think there's any way that you can run a public, uh, uh, an institution that serves the public in this way, um, and not give them a chance to, to at least review it and, and respond to it. Um, I think your time has expired, hasn't it, Mr. Butler? I mean, Mr. Johnson. My timer says I've got about four minutes and I'm certainly happy to address anything that, um, that, uh, uh, the court, any questions, go ahead. If you have, if you have some additional points to make, you're welcome to use your time. Yeah. Uh, yes, your honor, just a couple of them. Um, I mean, I think we've, we've covered the, um, the, the, the apprehension and disruption and balancing the interests, um, pretty well. Uh, I would again, reiterate that, that the information that, that the, that the, that the plaintiff had was, was very limited. And he knew at the time that he went and spoke that SLED was investigating this death, um, and, and didn't give, didn't give the investigation any time to develop. Um, and most importantly, as we've said, he didn't, he didn't run his concerns up the chain of command. Um, and, and I think one thing I want to be sure and point out was, um, you know, the, as, as my, my friend, Mr. Butler concedes, um, he says, this is a unique case. Well, I mean, if, if, if that is so, um, this court certainly can rule on, um, you know, any ground that, uh, that appears in the record. Um, and I would argue that, that, that I think it's clear that, that there is no first amendment violation, but, but if the court were to disagree, then it would certainly be a case, uh, where qualified immunity would apply. Um, because under the doctrine of qualified immunity, we don't second guess officials for bad guesses in unique cases, um, but, but for trans, transgressing bright lines. Um, and, and there's certainly not any bright lines in this case. If there were, it wouldn't be on appeal here for the second time. Um, I don't have anything further. I'm happy to answer any more questions the court may have. Certainly appreciate y'all's time. Judge Agee, do you have any further questions? Yeah, no further questions. All right. Judge Floyd, do you have further questions? Uh, no, sir. All right. Mr. Butler. Um, thank you, Mr. Johnson for your argument and Mr. Butler, we'd be happy to hear from you in rebuttal. Some facts that I want to clarify. Mr. Bilione did not lie repeatedly. He lied once and he corrected it within a matter of hours to the, to the extent that that matters. And Mr, uh, Judge Floyd, your question, I did confirm that other, uh, correctional officers did tell their wives, including the sheriff, told his wife. I'm glad, uh, Judge Wilkinson brought up Krause. Mr. Bilione did not attack the department. He told his wife, who is a member of the, who works for the press, about a video involving an inmate death in the facility where he worked. It was as least intrusive as it could possibly be. When he says there's a video of this, you might want to check it out. And to say that he doesn't have personal knowledge, I think that that's just wrong. But if you look at the, the concurring opinion, which is very well reasoned, I agree, in Krause, um, it says it is clearly established, established law in this circuit that police officers may speak about a department's efforts to cover up an incident of excessive force. And I know Mr. Johnson doesn't agree with me that there was an attempt to cover up and there was a lie, but you have to remember, you have to view this in the light most favorable to Mr. Bilione at this point. I also have to point out. But if your fear is covering up, it would seem to me that having somebody go up the chain of command and explain first to the sheriff everything they know and explain any reservations about a different account of the incident or whatever. In other words, having someone go initially, only as an initial matter, up the chain of command and laying bare his concerns first internally, that's the very opposite of covering something up. That's, that's trying to make information available. And, um, and so you, it's a two step process here, isn't there? One, you try to, um, make sure that the police department, when it, or that the sheriff's judgment has a full array of information at its command, that's the opposite of covering up something. And then if you're still dissatisfied, then at that point, um, you can go public with it. But, um, it's just a, you know, um, concepts of exhaustion of administrative remedies or just exhaustion generally. This is not a classic case of exhaustion of administrative remedies, but, but questions of exhaustion, um, of one's options are very common in law. And isn't, isn't that all we're, we're asking for here is, and all we're concerned about here is a failure to exhaust. Isn't that, isn't that the case, Mr. Butler? I think that is. And I think you could always Monday morning quarterback and say, somebody could have done it better, but that doesn't mean that he's required to do so. I don't know how a person is supposed to know when the internal investigation is completed, especially when the spokesperson for the sheriff's department says what he says. But with respect to the coverup, I have to make one thing clear when we want to talk about how people could have done things differently. Why doesn't the sheriff turn over the video? Now, if you want to talk about evidence of a coverup, and we know that not only is, and I'm sorry, and like most favorable to Mr. Bilioni, Trent Ferris is lying. Nobody can watch that video and think otherwise. And then he refuses to turn over the video. Now, if his officers did everything appropriate and everything perfectly, why not let the world see the video? Why not? There's no reason that not turn over that video if it's going to exonerate his people and his department, and that the voting public of York County will know how he runs his institution better than turning over that video, and he doesn't do it. To this day, no one's seen. Well, but there's no attempt to keep the video from becoming public. It's just a question of when. So far, it's, what are we, eight years into it, he won't turn it over. It's been foiled by the press, and he will not turn it over. He kept it from SLED. SLED wanted to see it, and SLED didn't get to see it. Oh, that's right. I'm sorry. He wouldn't turn it over to SLED. He let SLED watch it. No, no. He drove, the reporter drove to SLED, and the reporter drove to SLED, and the sheriff called SLED. That's right, right. I'm sorry. The sheriff told SLED not to turn over the video to the reporter. There's no doubt he doesn't want anybody seeing that video. It's all right. We, any of my colleagues have any further questions? Judge Agee, Judge Floyd, you all have any questions? No further questions. Okay. Thank you both. We appreciate your arguments. Both of you, great deal. And we'll take a five-minute break and then head into our next case. Okay. This Honorable Court will take a brief recess.
judges: J. Harvie Wilkinson III, G. Steven Agee, Henry F. Floyd